Abdul Muhammad SAMAAD,
Plaintiff–Appellant,

v.

CITY OF DALLAS, State Fair of Texas, Dallas Grand Prix Co., and Larry Waldrop, Defendants–Appellees.

Delores PIERCE, et al.,
Plaintiffs–Appellants,

v.

CITY OF DALLAS, Auto Racing of Dallas, Inc., and Sports Car Club of America, Inc., Defendants–Appellees.

Delores PIERCE, et al.,
Plaintiffs–Appellees,

v.

CITY OF DALLAS, et al., Defendants,

Frank Wise, Defendant–Appellant.

Nos. 90–1099, 90–1721 and 90–1722.

United States Court of Appeals,
Fifth Circuit.

Aug. 23, 1991.

Neil H. Cogan, Dallas, Tex., for Abdul Muhammad Samaad, et al., and Delores Pierce, et al.

Marston Alexander, Russell Smith, Dallas, Tex., for State Fair of Texas and Waldrop.

Martin R. Merritt, George A. Otstott, Otstott & Guerrero, Dallas, Tex., for Auto Racing.

T. Marston Alexandar, Dallas, Tex., for Sports Car Club.

Thomas P. Brandt, Asst. City Atty., Dallas, Tex., for City of Dallas and Frank Wise.

Before GOLDBERG, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this case, plaintiffs contend that defendants' running of two grand prix automobile races in a public park near their homes effected a taking of their property without just compensation, deprived them of property without due process of law, denied them equal protection of the laws, and violated state law. The district court entered summary judgment for defendants on each federal law claim except for the equal protection claim, with respect to which it ordered limited discovery regarding one defendant's claim of qualified immunity. We affirm the court's grant of summary judgment but reverse its denial of qualified immunity and concomitant discovery order and remand for further proceedings.

## I. FACTS AND PROCEDURAL BACKGROUND.

### A. No. 90–1099, *Samaad v. City of Dallas.*

From July 5–8, 1984, defendant Dallas Grand Prix Co. (Dallas Grand Prix) held a series of automobile races at Fair Park, a public park belonging to the defendant City of Dallas (City). Fair Park is the site of the Cotton Bowl and the Texas State Fair. Defendant State Fair of Texas (State Fair), a non-profit corporation, manages Fair Park pursuant to a longstanding agreement with the city. State Fair leased Fair Park to Dallas Grand Prix for the days of the race.

Plaintiffs[1] reside in the neighborhood surrounding Fair Park. In their complaint,

---

1. Because of a defective notice of appeal, plaintiff Abdul Samaad is the only appellant in No. 90–1099, despite the existence of numerous plaintiffs. We dismissed the appeal of the remaining plaintiffs in No. 90–1099. *See Samaad v. City of Dallas,* 922 F.2d 216 (5th Cir.1991) (per curiam) ("*Samaad I*"). Because we discuss many of the common issues in *Samaad* and

they contend that noise from the races impaired their use and enjoyment of their homes. They also assert that they suffered various physical and psychological ailments as a result of the races.

. The plaintiffs seek recovery for their alleged injuries pursuant to 42 U.S.C. § 1983, asserting claims under the Due Process and Takings Clauses of the Fifth Amendment. They add pendent [2] state law claims under Texas common law. The district court granted defendants' motion for summary judgment with respect to the takings and due process claims and dismissed the pendent state law claims without prejudice. *Samaad v. City of Dallas*, 733 F.Supp. 239 (N.D.Tex.1990).

### B. Nos. 90–1721 and 90–1722, *Pierce v. City of Dallas.*

The complaint in this case focuses upon similar grand prix races held from April 29 through May 1, 1988, at Fair Park. Plaintiffs brought suit against the city, Frank Wise (a city official), Auto Racing of Dallas, Inc., and Sports Car Club of America, Inc.

Unlike the *Samaad* plaintiffs, the *Pierce* plaintiffs charge the defendants with racial discrimination, alleging that defendants would have acted differently had the neighborhoods surrounding Fair Park been predominantly white. According to the complaint, most of the people living near Fair Park are "members of racial minority groups." The complaint does not allege that defendants selected Fair Park for the race over a suitable location in a predominantly white neighborhood; plaintiffs do not even claim that another appropriate site exists.

Plaintiffs nonetheless seek recovery under the Equal Protection Clause, the Due Process Clause, the Takings Clause, and state and local law, again using section 1983 as the procedural vehicle for the federal claims. The district court granted

summary judgment for defendants on all the federal claims except the equal protection claim, with respect to which the court stated that it was unable to rule on Wise's assertion of qualified immunity without discovery into his alleged discriminatory intent.

### C. The Scope of the Appeals.

Desiring to appeal simultaneously from their defeats on the takings and due process claims in both *Samaad* and *Pierce,* the *Pierce* plaintiffs successfully sought a final judgment under Fed.R.Civ.P. 54(b). Because the equal protection claim remained pending, plaintiffs would not have been able to appeal the otherwise interlocutory order denying their other federal law claims without the rule 54(b) judgment (or some other special circumstance, such as permission to take an interlocutory appeal pursuant to 28 U.S.C. § 1292(b)). The *Samaad* defendants now argue that a rule 54(b) judgment was unavailable to the district court and that thus we are without jurisdiction.

In *Samaad* (No. 90–1099), the remaining appellant, plaintiff Abdul Samaad, appeals the district court's entry of summary judgment for defendants on his federal law claims, as do the *Pierce* plaintiffs. The defendants argue not only that the district court correctly granted summary judgment, but also that the takings claim is unripe. Defendant Frank Wise brings his own appeal in No. 90–1722, arguing that the court erred in ordering discovery with respect to the equal protection claim. The *Pierce* plaintiffs contend that we are without jurisdiction over Wise's appeal because the court's discovery order is not a "final judgment" under 28 U.S.C. § 1291. Accordingly, we must address five main issues: (1) whether a rule 54(b) judgment was available to the district court; (2) whether the "taking for a public use with-

---

*Pierce* simultaneously, we will use the term "plaintiffs" throughout. The context of the discussion will make plain the parties to whom we are referring.

**2.** In accordance with the Judicial Improvements Act of 1990, Pub.L. 101–650, title III, § 310, 104

Stat. 5113 (Dec. 1, 1990), for actions commenced on or after December 1, 1990, the term "supplemental jurisdiction" is used in lieu of "pendent jurisdiction." *See* 28 U.S.C. § 1367 (1991).

out just compensation" claim is ripe for adjudication; (3) whether the court properly granted summary judgment with respect to the takings and due process claims; (4) whether we have jurisdiction over Wise's appeal; and (5) whether the court erred in rejecting Wise's assertion of qualified immunity and in ordering discovery.

## II. AVAILABILITY OF THE RULE 54(b) JUDGMENT.

In their complaint, the *Pierce* plaintiffs seek recovery under a variety of theories, alleging that defendants (1) denied them equal protection of the laws; (2) deprived them of property without due process of law; (3) took their property without just compensation; and (4) transgressed state law. The *Pierce* complaint differs from that in *Samaad* insofar as the former includes an equal protection claim.

Defendants successfully moved for summary judgment with respect to the takings and due process claims. However, the court declined to grant summary judgment on the equal protection claim, instead permitting plaintiffs to conduct discovery into Wise's alleged discriminatory intent. As the district court also had granted the *Samaad* defendants summary judgment, the *Pierce* plaintiffs desired to appeal these two defeats together. However, the order in *Pierce* remained interlocutory,[3] for the equal protection claim against Wise and Dallas still was pending.

The *Pierce* plaintiffs therefore sought a final judgment under rule 54(b). The district court granted the motion and entered judgment, thus allowing the plaintiffs simultaneously to appeal both *Samaad* and *Pierce*. The city and Wise moved to dismiss the appeal (No. 90–1721), arguing that the court's grant of a final judgment under rule 54(b) was improper.[4] An administrative panel of this court denied the motion without prejudice but suggested that this panel revisit the issue.

Rule 54(b), entitled "Judgment upon Multiple Claims or Involving Multiple Parties," provides in pertinent part,

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Thus, a court may grant a rule 54(b) judgment only if "more than one claim for relief is presented in an action" or "multiple parties are involved." The district court apparently granted the instant rule 54(b) motion on the ground that the action presented multiple claims. The city and Wise disagree and argue that the court could not properly invoke rule 54(b).[5]

---

3. Interlocutory orders generally are unappealable. *See* 28 U.S.C. § 1291 (Supp.1991) (courts of appeals have jurisdiction over appeals from final decisions).

4. The other defendants (Auto Racing of Dallas and Sports Car Club of America) do not challenge the propriety of the rule 54(b) judgment as it relates to them; the entry of the judgment with respect to those parties plainly falls within the "multiple parties" provision of rule 54(b). *See infra* note 15. Furthermore, no claims remain pending against them in the district court.

5. The argument presented in the municipal defendants' motion to dismiss the appeal is somewhat inexact. They correctly imply that (assuming for the moment that multiple parties are not present) a court may not grant a rule 54(b) judgment unless "more than one claim for relief is presented." However, their motion seems to vacillate between an argument that there was only one claim and an assertion that, even if there were multiple claims, a rule 54(b) judgment somehow was otherwise inappropriate.

More specifically, the city and Wise refer to "decided and retained claims" and "taking claims and equal protection claims," implying

■ We note initially that the proper method for reviewing a rule 54(b) judgment is not well established. The language of the rule lends itself to two distinct challenges to a rule 54(b) judgment predicated upon the existence of multiple claims. First, an appellee seeking dismissal of an appeal could argue that the complaint does not present "more than one claim for relief." This is a legal question that could be raised *sua sponte* by a court of appeals concerned that it might not have jurisdiction. The court of appeals would review *de novo* the district court's finding of separate claims.

Second, an appellee could contend that, assuming the complaint presents multiple claims, the district court nonetheless abused its discretion[6] in entering judgment. In such a situation, the court of appeals would consider whether the district court abused its discretion in determining whether "there [was] no just reason for delay." If the appellee did not challenge the district court's exercise of discretion (as opposed to its finding of multiple claims), the court of appeals could not consider the issue *sua sponte*, for it would not go to the appellate court's jurisdiction.

■ One commentator has suggested that some courts have conflated the two inquiries. *See* 6 James W. Moore et al., *Moore's Federal Practice* ¶ 54.33[2] at 54-194 (2d ed. 1991). Similarly, in *Local P-171, Amalgamated Meat Cutters v. Thompson Farms Co.*, 642 F.2d 1065, 1070 (7th Cir.1981) (hereinafter *Meat Cutters*), Judge Wisdom, sitting by designation, opined as follows:

> Indeed, since the exercise of the district court's discretion in granting Rule 54(b) certification already involves a balancing of the value of accelerated repose to the litigants against the potential inconvenience to the appeals court posed by overlap between certified claims and noncertified claims, and since that determination can be reviewed by the appellate courts for abuse of discretion, it is hard to see what additional function the formal characterization of claims as 'separate' or 'identical' serves. [Footnote omitted.]

Despite the attractiveness of this approach, we nonetheless feel constrained to adhere to our prior view that a review of a rule 54(b) judgment involves at least two potential inquiries. In *H & W Industries*, 860 F.2d at 175, we analyzed the appellees' motion to dismiss the appeal as involving two separate questions.[7] We also believe that this view better comports with the language of the rule, which patently contemplates both legal and discretionary inquiries.

Even if we are able to differentiate nicely between the legal and discretionary aspects of rule 54(b) judgments, a great deal of uncertainty nonetheless remains, for we must consider the unsettled question of what exactly is a "claim for re-

---

that the *Pierce* plaintiffs presented multiple claims; at the same time, defendants refer to "Plaintiffs' single claim for relief," thereby expressing a contrary assertion. The cases cited in the motion to dismiss all consider the scope of a single "claim for relief"; those cases do not create any categorical rule that somehow limits the application of rule 54(b) even where the case involves multiple claims. We therefore construe defendants' motion as arguing that the complaint does not present "more than one claim for relief."

6. *H & W Indus. v. Formosa Plastics Corp.*, 860 F.2d 172, 175 (5th Cir.1988).

7. In addressing the first inquiry, we stated, "A district court decision to certify its judgment on some portion of a multiple claim as an appealable final judgment under Rule 54(b) is a discre-

tionary act, which is not subject to second-guessing by this Court. Instead, the decision is reviewed for abuse of discretion." *Id.* (citations omitted). Later in the opinion, we stated, "There must also be consideration of a non-discretionary aspect of a district court's decision to certify a judgment for appeal under Rule 54(b)." *Id.* We then considered whether the complaint had presented multiple claims for relief. *See also Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980) (mandating separate review of "juridical" and "discretionary" aspects of rule 54(b)); *Spiegel v. Trustees of Tufts College*, 843 F.2d 38, 44 (1st Cir.1988) (assuming without deciding that complaint presented multiple claims and proceeding to review district court's exercise of discretion); *Purdy Mobile Homes v. Champion Home Builders Co.*, 594 F.2d 1313, 1316 (9th Cir.1979) (similar distinction).

lief." [8] The most that can be said confidently about this question is that various courts focus upon different things but are reluctant to articulate hard-and-fast tests.[9]

Some courts concentrate on the facts underlying the putatively separate claims. For instance, in *Jack Walters & Sons*, 737 F.2d at 702, the court sought to define "claim for relief" in light of what it deemed to be rule 54(b)'s purpose: "to spare the court of appeals from having to keep relearning the facts of a case on successive appeals." Accordingly, it held that "if the facts underlying different claims are different, the claims are separate for Rule 54(b) purposes." *Id.*

Similarly, in *Purdy Mobile Homes*, 594 F.2d at 1316, the court rejected an argument that there was only one claim because some facts were common to all the theories of recovery. The fact that one claim required proof of facts different from those required to prove another claim rendered it "separate." *Id.*[10] *See also Gas–A–Car*,

484 F.2d at 1105; 6 Moore et al., *supra*, ¶ 54.33[2] at 54–194.[11]

Other courts have rejected this fact-bound test and have focused upon the possibility of separate recoveries under arguably separate claims. They have developed what one commentator has labeled a "legal rights test," under which common underlying facts do not preclude the existence of similar claims. 6 Moore et al., *supra*, ¶ 54.33[2] at 54–196 n. 31 (discussing *Tolson* ).

■ Nonetheless, certain points of agreement emerge from the cases. For instance, "[i]t is clear that a claimant who presents a number of alternative legal theories, but whose recovery is limited to only one of them, has only a single claim of relief for purposes of Rule 54(b)." *Page*, 585 F.2d at 339 (citing *Edney v. Fidelity & Guar. Life Ins. Co.*, 348 U.S. 136, 138 (8th Cir.1965)).[12] Although courts generally

---

8. Numerous courts and commentators have observed the difficulty of this inquiry. *See Jack Walters & Sons v. Morton Bldg.*, 737 F.2d 698, 701–02 (7th Cir.) (noting that "the meaning that the draftsmen [of rule 54(b) ] intended 'claim for relief' to bear is not clear" and that "the Supreme Court has not yet attempted a compendious definition"), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984); *Tolson v. United States*, 732 F.2d 998, 1001 (D.C.Cir.1984) ("Rule 54(b) precedent is untidy"); *Meat Cutters*, 642 F.2d 1065, 1070 ("courts have been completely unable to settle on a single test for determining when claims are 'separate'"); *Page v. Preisser*, 585 F.2d 336, 339 (8th Cir.1978) ("Courts have struggled in attempting to delineate a precise definition of 'claim' for purposes of Rule 54(b)."); *Gas–A–Car, Inc. v. American Petrofina, Inc.*, 484 F.2d 1102, 1104 (10th Cir. 1973) ("determining whether Rule 54(b) was properly invoked is no easy matter"); 6 Moore et al., *supra*, ¶¶ 54.24, 54.33[2]; 10 Charles A. Wright et al., *Federal Practice & Procedure* § 2657 at 60–61 (2d ed. 1983).

   The Supreme Court has not yet addressed this issue directly. In *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 743 n. 4, 96 S.Ct. 1202, 1206 n. 4, 47 L.Ed.2d 435 (1976), the Court stated, "We need not here attempt any definitive resolution of the meaning of what constitutes a claim for relief within the meaning of the rules." It is perhaps the difficulty of defining "claim for relief" that has led some courts to conduct a single inquiry in reviewing judgments under Rule 54(b).

9. *See Tolson*, 732 F.2d at 1001 ("[w]e offer no universal formulas"); *Meat Cutters*, 642 F.2d at 1070 ("Rather than attempting to advance a general definition of what constitutes 'separate claims', we conclude that a better approach is to state rules of thumb...").

10. This "proof of different facts" test bears a striking similarity to that employed in the double jeopardy context. *See Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

11. Judge Wisdom pointed out the difficulties of applying a test based upon the underlying facts:

   Given the infinitely differing degrees of factual overlap that a given set of claims and counterclaims may present, only a definition of 'separate claims' as claims resting on entirely different facts could be applied systematically. Yet the Supreme Court rejected such a mechanical definition in *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956), and *Cold Metal Process Co. v. United Eng'g & Foundry Co.*, 351 U.S. 445, 451–52, 76 S.Ct. 904, 908, 100 L.Ed. 1311 (1956), both of which held that 'separate claims' for Rule 54(b) purposes can arise out of the same transaction and can overlap in important respects.
   *Meat Cutters*, 642 F.2d at 1070.

12. *See also H & W Indus.*, 860 F.2d at 175–76 (citing *Schexnaydre v. Travelers Ins. Co.*, 527 F.2d 855, 856 (5th Cir.1976) (per curiam); *Unit-*

agree on these points, they do not fully reveal the contours of the phrase "claim for relief." And we are reluctant, at least in this case, to rush in where other courts fear to tread. Like them, rather than attempting to formulate a generally applicable definition, we take note of the foregoing "rules of thumb" and decide the case at hand.[13]

■ The equal protection and takings claims [14] are separate partly because "the two grounds of recovery are not mutually exclusive." *H & W Indus.,* 860 F.2d at 176. The distinct prayers for relief depend upon the violation of separable constitutional rights.

The heart of the Equal Protection Clause is its prohibition of discriminatory treatment. If a governmental actor has imposed unequal burdens based upon race, it has violated the clause. The extent of the burden imposed does not determine whether the clause has been violated. But whether a violation of the Takings Clause has occurred depends primarily upon the degree of the burden the government has imposed upon the claimant. We do not see any reason why an aggrieved plaintiff could not simultaneously recover for these separate violations, even though they arise out of the same general set of facts, assuming that there is no duplicate recovery for the same injury.

Were we to adopt the stance of those courts that have focused upon the facts underlying the putatively separate claims, we would conclude nevertheless that the equal protection and takings claims are separate for purposes of rule 54(b). Without question, each claim requires proof of facts that the other does not. More specifically, to prove an equal protection violation, the *Pierce* plaintiffs would have to show that defendants acted with the requisite discriminatory intent. By way of contrast, a plaintiff would have to prove a "taking" of his property to obtain recovery under the just compensation clause.

Accordingly, the plaintiffs presented separate claims for relief for purposes of rule 54(b). Therefore, a rule 54(b) judgment at least was potentially available to the district court. The city and Wise do not argue, and we do not find, that the district court abused its discretion in concluding that there was no just reason for delaying an appeal.[15]

---

*ed States v. Crow, Pope & Land Enters.,* 474 F.2d 200, 202 (5th Cir.1973)); *Spiegel,* 843 F.2d at 44 n. 6; *Yorkville Nat'l Bank v. Bassak (In re Bassak),* 705 F.2d 234, 237 (7th Cir.1983); *Meat Cutters,* 642 F.2d at 1070–71 ("claims cannot be separate unless separate recovery is possible on each" (citations omitted)).

**13.** The necessity of articulating a universal test (or even of choosing from among the emphases of the various courts) is undermined by the relatively self-evident result in this case. Even assuming that the divers "tests" could produce divergent results in an actual case, this certainly is not such a case.

**14.** Although we recognize that the *Pierce* plaintiffs additionally assert a due process claim (which the district court also dismissed), our primary focus is upon the distinction between the equal protection and takings claims. The district court and the parties essentially treated the due process claim as an adjunct to the takings claim. Indeed, had the court decided the takings claim and left the due process claim pending, our result might be different.

**15.** The city and Wise make an additional, independent argument as to why entry of judgment under rule 54(b) was improper. They cite 6 Moore et al., *supra,* ¶ 54.33[3], at 54–201, for the proposition that "[b]efore Fed.R.Civ.P. 54(B) [sic] can be invoked against a party, the district court must dispose of the total interest of the party." They contend that the rule 54(b) judgment was improper because "the district court has failed to dispose of all the claims and defenses pertaining to the City of Dallas and Frank Wise...."

The cited section from the treatise is taken entirely out of context. In that section, the treatise is discussing the multiple parties scenario. In that situation, a court cannot grant a rule 54(b) motion with respect to any ruling merely because multiple parties are involved. For example, one party in a multiple party action could not appeal a discovery ruling simply on the ground that the case involves multiple parties.

The section in question addresses this scenario. Without defendants' creative editing, the pertinent section of the treatise states, "before the Rule can be invoked on the ground of the involvement of multiple parties, *without the existence of more than one claim,* the court must dispose of the total interest of a party, though of course a single action may, and often will, present more than one claim for relief and also involve multiple parties." *Id.* (emphasis added) (footnote omitted).

## III. RIPENESS OF THE TAKINGS CLAIM.

### A. Taking for Public Use.

The Takings Clause of the Fifth Amendment directs that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Supreme Court has held that the clause applies to the states through the Fourteenth Amendment. *See Chicago B. & Q.R.R. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

■ The municipal defendants argue that the takings claims in both *Pierce* and *Samaad* are not ripe [16] because plaintiffs failed to seek just compensation in state court. A takings claim is not ripe until the claimant has unsuccessfully sought compensation from the state. *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194, 105 S.Ct. 3108, 3120, 87 L.Ed.2d 126 (1985). In *Williamson County*, the Court reasoned as follows:

> [B]ecause the Fifth Amendment proscribes takings *without just compensation*, no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action.

*Id.* at 194 n. 13, 105 S.Ct. at 3120 n. 13 (emphasis in original). The Court concluded that Hamilton Bank's takings claim was not ripe because it had failed to utilize available state procedures.[17] The Court implicitly qualified its requirement that takings claimants seek compensation in the state system: "[I]f a State provides an *adequate* procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195, 105 S.Ct. at 3121 (emphasis added).

Claimants who have failed to seek compensation through available state procedures frequently argue that those procedures are "inadequate" and that resort thereto would have proven futile.[18] In *Williamson County*, the Court did not elaborate on what it meant by "adequate" procedures. However, its discussion of the state procedures at issue in that case sheds some light on this question.

In describing Tennessee's inverse condemnation procedures, the Court noted that the state courts had interpreted the pertinent statute "to allow recovery through inverse condemnation where the 'taking' is effected by restrictive zoning laws or development regulations." *Id.* at 196, 105 S.Ct. at 3122. (The *Williamson County* plaintiff had alleged such a taking.) The Court thus implied that had the state courts *not* allowed recovery in such circum-

---

Accordingly, the court need dispose of the "total interest of a party" only in those cases involving multiple parties and single claims. As discussed *supra*, this case involves multiple claims. On that ground does the rule 54(b) judgment rest (insofar as it relates to the city and Wise). Accordingly, defendants' argument in this regard is without merit.

16. The requirement that a dispute be "ripe" is but one manifestation of the Constitution's "case or controversy" requirement. *See* U.S. Const. art. III, § 2.

17. The Court rested its conclusion on an additional, independent ground: The claim was not ripe because the plaintiff "ha[d] not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations" that effected the alleged taking. 473 U.S. at 186, 105 S.Ct. at 3116.

18. *See, e.g., Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1542 n. 13 (11th Cir.1991), *peti-*

tion for cert. filed, No. 90–1707, 59 U.S.L.W. 3783 (May 6, 1991); *Del Monte Dunes, Ltd. v. City of Monterey*, 920 F.2d 1496, 1507 (9th Cir. 1990); *Corn v. City of Lauderdale Lakes*, 904 F.2d 585, 586 (11th Cir.1990); *Estate of Himelstein v. City of Fort Wayne*, 898 F.2d 573, 576 (7th Cir.1990); *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 864 F.2d 1475, 1479 (9th Cir.), *modified*, 882 F.2d 1398 (9th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990); *Austin v. City & County of Honolulu*, 840 F.2d 678, 680 (9th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). This argument is conceptually similar to those made by plaintiffs seeking to bring shareholder derivative suits but who have not made a demand on the directors. *See generally Kamen v. Kemper Fin. Servs.*, —— U.S. ——, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991); Deborah A. DeMott, *Shareholder Derivative Actions* § 5:03 (1987).

stances, the procedures would have been "inadequate." There is merit to the Court's implicit conclusion that the mere existence of *some* compensation mechanism does not necessarily render those procedures adequate.

Other cases illuminate the nature of "adequate" compensation procedures. A number of courts have held, for example, that the unsettled status of state law does not render the available procedures "inadequate." *See, e.g., Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 505 n. 8 (9th Cir.1990); *Del Monte Dunes,* 920 F.2d at 1507; *Estate of Himelstein,* 898 F.2d at 576. These cases indicate that "inadequate" procedures are those that *almost certainly* will not justly compensate the claimant.

The Takings Clause itself justifies this conclusion. To violate the clause, the state must not only take someone's property but also deny him compensation. Accordingly, before a takings claim is ripe, the claimant must unsuccessfully seek compensation. Short of that, it must be certain that the state *would* deny that claimant compensation were he to undertake the obviously futile act of seeking it.

Because the *Samaad* and *Pierce* plaintiffs did not seek compensation under available state procedures, we must address their argument that such an effort would have been futile. Plaintiffs bear the burden of persuasion on this issue. *Del Monte Dunes,* 920 F.2d at 1506–07; *Austin,* 840 F.2d at 680; *Norco Constr. v. King County,* 801 F.2d 1143, 1146 (9th Cir.1986).

Before considering the adequacy of Texas's procedures, we address three preliminary contentions. Noting that the district court did not consider the ripeness issue, plaintiffs argue that "it would be inappropriate for this Court to decide, in the first instance, whether Texas does provide an adequate process to obtain relief." We disagree. Because ripeness, and hence federal court jurisdiction, turn on the adequacy of Texas's procedures, we may consider

this question of law. *Accord Austin,* 840 F.2d at 680 n. 2 (considering adequacy of state remedies even though district court had not done so).

Plaintiffs also argue that defendants waived the ripeness issue by failing to bring it to the district court's attention early enough in the litigation. The court confronted and rejected an identical argument in *Sinaloa Lake.* In that case, the defendants waited over two years before raising the ripeness issue on the virtual eve of trial. 864 F.2d at 1480 n. 3. Nonetheless, the court concluded that laches cannot bar a *Williamson County* argument, as ripeness is a jurisdictional requirement that cannot be waived. *Id.* at 1480. We agree.[19]

Plaintiffs also contend that they complied with *Williamson County* by adding pendent state claims to their federal claims. They argue that the federal district court should consider the pendent state claim first; if it rejects the claim, then the federal takings claim becomes ripe.

We reject this argument for two reasons. First, it does not comport with the reasoning of *Williamson County,* in which the Court found the claims unripe because the plaintiff there "did not seek compensation *through the procedures the State has provided* for doing so." 473 U.S. at 194, 105 S.Ct. at 3120 (emphasis added) (footnote omitted). The Court added, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause *until it has used the procedure* and been denied just compensation." *Id.* at 195, 105 S.Ct. at 3121 (emphasis added). The local entity from which a plaintiff seeks recovery should be the one to deny just compensation.

Second, a federal district court could not exercise jurisdiction over a state law claim that is pendent to a claim over which the federal courts would have no jurisdiction. Assuming a takings claim were the only federal claim asserted in the complaint, the

**19.** Plaintiffs' argument that there is some distinction between "article III" ripeness and ripe-

ness in takings cases is without merit.

court could not exercise jurisdiction over the pendent state compensation claim, for the federal takings claim on which jurisdiction over the state claim would be contingent would not yet be ripe. The circularity of plaintiffs' suggested procedure proves fatal.

■ Moving now to the adequacy of Texas's procedures for obtaining just compensation, we conclude that plaintiffs have not carried their burden of establishing that Texas law unquestionably would afford them no remedy. In the "seminal" [20] case of *City of Abilene v. Downs*, 367 S.W.2d 153, 159 (Tex.1963), the court held that if the offending conduct undertaken by the governmental entity "results in a nuisance, such acts ... constitute a damaging or taking of property under Section 17 of Article I of the Texas Constitution." Subsequent Texas caselaw has acknowledged this avenue for recovery under section 17.[21] For example, in *City of Abilene v. Smithwick*, 721 S.W.2d 949, 951 n. 2 (Tex.App.—Eastland 1986, writ ref'd n.r.e.), the court observed that "[t]he [Texas] Supreme Court has recognized that proof of a nuisance might also allow a plaintiff to recover under TEX. CONST. art. I, sec. 17." Similarly, in *Abbott v. City of Kaufman*, 717 S.W.2d 927, 931 (Tex.App.—Tyler 1986, writ dism'd), the court stated that the *Downs* court "distinguished between the city's immunity from tort liability for nuisance, as such, and its duty under the Constitution to pay compensation for a damaging or taking resulting from the nuisance." [22]

We reject plaintiffs' argument that Texas law compensates only those claimants whose property interests have been undermined by narrowly-defined "public works." Plaintiffs rely upon *Steele v. City of Houston*, 603 S.W.2d 786, 790 (Tex.1980), which states that "[t]he Constitution limits compensation to damages 'for or applied to public use,' and judicial restraints have narrowed that phrase to damages that arise out of or as an incident to some kind of public works."

Although this language appears to strengthen plaintiffs' contention, *Steele* nonetheless provides inadequate support. For instance, the cases cited by the *Steele* court do not constitute "judicial narrowings" of the "public use" language in section 17. More importantly, the facts of *Steele* call into question plaintiffs' preferred reading of the case.

In *Steele*, city police burned down plaintiffs' house in order to smoke out some escaped convicts that had taken refuge there. *Id.* at 788, 789. In remanding the case for trial, the court stated that the plaintiffs would be entitled to prove "that the destruction was done 'for or applied to public use.'" *Id.* at 791–92. The court also observed the following: "That the destruction was done for the public use is or can be established by proof that the City ordered the destruction of the property because of real or supposed public emergency to apprehend armed and dangerous men who had taken refuge in the house." *Id.* at 792.

This language somewhat undermines plaintiffs' argument that takings claims may arise only out of the construction or operation of things like highways and wa-

---

**20.** *City of Port Arthur v. Bowling*, 551 S.W.2d 155, 157 (Tex.Civ.App.—Beaumont 1977, writ ref'd n.r.e.).

**21.** This provision of the Texas Constitution provides,

No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities, shall be made; but all privileges and franchises granted by the Legis-

lature, or created under its authority shall be subject to the control thereof.
Tex. Const. art. I, § 17.

**22.** *See also City of Uvalde v. Crow*, 713 S.W.2d 154, 156 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.) ("Both parties concede that liability may be imposed on the City only if its operation of the plant constituted a nuisance, under the so-called nuisance exception to the governmental immunity rule in Tex. Const. art. I, § 17...."); *Bragg v. City of Dallas*, 605 S.W.2d 669, 671 (Tex.Civ.App.—Dallas 1980, no writ) (recognizing existence of nuisance theory of taking).

terways; the court contemplated the possibility that burning down someone's house to recapture escaped criminals can be for a "public use." Furthermore, our research has revealed only one subsequent case in which the court relied upon *Steele*'s reference to "public works." In *Abbott,* the court reiterated *Steele*'s proposition that "judicial decisions have narrowed the meaning of 'public use' to those situations in which the damages are incident to the construction and operation of a public work." 717 S.W.2d at 932 (citing *Steele*). The *Abbott* court declared that "[i]t is this element that distinguishes the instant case from ... cases relied on by City." *Id.* *Abbott* involved landowners' claims that water discharged by the city's sewage treatment plant damaged their land. The court distinguished the case before it from *Texas Highway Dep't v. Weber,* 219 S.W.2d 70 (1949), a case cited by the city in that case, stating that the *Weber* plaintiffs lost their suit because the damage to their land "did not result from the construction of a public work." 717 S.W.2d at 932.

However, the *Abbott* court's own discussion of *Weber* reveals that the plaintiffs in *Weber* were unsuccessful because they based their claims on negligence; defendants there did not argue that no recovery was possible because the loss did not arise out of the construction or operation of "public works." The other cases cited by the city in *Abbott* similarly did not rely

upon some narrow definition of "public use" to reach their respective results.[23]

While we by no means opine that the "public works" requirement has been abandoned in Texas, it is uncertain how Texas courts would treat the *Samaad* and *Pierce* plaintiffs' takings claim. Given that the unsettled status of state law does not render the available procedures "inadequate,"[24] we conclude that plaintiffs' claim that their property was taken for a public use without just compensation is unripe under *Williamson County.* Accordingly, the district court was without jurisdiction to consider that claim.[25]

### B. Taking for Private Use.

In the preceding section, we have concluded that plaintiffs' failure to seek just compensation rendered one of their claims unripe. However, this holding does not dispose of all of the claims. More specifically, *Williamson County* does not apply to those claims in which plaintiffs contend that defendants took their property for a *private* purpose.

The Fifth Amendment prohibits both uncompensated takings and takings for a private purpose. In other words, a taking for a private purpose is unconstitutional even if the government provides just compensation. *See Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 241, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984) (citing cases prohibiting private takings "even though compensation be paid").[26] Accordingly,

---

**23.** The *Abbott* court conceded as much: "[T]here was ... no discussion of the 'public use' requirement" in the cases cited by the city. 717 S.W.2d at 932 (discussing *City of Texarkana v. Taylor,* 490 S.W.2d 191 (Tex.Civ.App.—Texarkana 1972, writ ref'd n.r.e.); *Steele v. City of El Paso,* 417 S.W.2d 923 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.)).

**24.** *See Southern Pac. Transp. Co.,* 922 F.2d at 505 n. 8; *Del Monte Dunes,* 920 F.2d at 1507; *Estate of Himelstein,* 898 F.2d at 576.

**25.** As we conclude, *infra,* that there is no taking in this case, our jurisdictional conclusion regarding any taking for public use does not affect the outcome of this appeal.

**26.** In *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 464 (7th Cir.1988), Judge Posner discusses the relationship between the

Takings and Due Process Clauses of the Fifth Amendment and considers the possibility that the Takings Clause in itself does not prohibit takings for a private purpose:

> It can be argued that if the taking is not for a public use, it is unconstitutional, but perhaps not as a taking; for all the takings clause says is 'nor shall private property be taken for public use, without just compensation.' This language specifies a consequence if property is taken for a public use but is silent on the consequences if property is taken for a private one. Perhaps the effect of this silence is to dump the case into the due process clause. The taking would then be a deprivation of property without due process of law.

Judge Posner raises a number of objections to this colorable construction of the Takings Clause, noting that the Supreme Court has implied the availability of a remedy under the

plaintiffs' failure to seek compensation for the alleged taking of their property for a private purpose does not render that claim unripe.[27] Therefore, we must consider whether the court properly granted summary judgment on that claim.

## IV. PROPRIETY OF SUMMARY JUDGMENT.

Coming now to the merits of plaintiffs' takings claim, we conclude that they have neither alleged nor proved a "taking" of their property as that term is used in the Constitution.[28] Accordingly, we affirm the district court's grant of summary judgment.

In reviewing a district court's disposition of a summary judgment motion, we apply the same test as did the district court. *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987). The pertinent test is supplied by Fed.R. Civ.P. 56(c), which provides that summary judgment shall be granted if the record evidence relied upon by the parties "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are

material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The dispute in this case centers on the "substantive law." Plaintiffs argue that takings law is characterized by a three-part test and that they have created a genuine issue of material fact with respect to each element of that supposed test. Defendants counter that there is no rigid "three-part test" and that plaintiffs have not created a genuine issue of material fact under the proper test for a taking. Agreeing with defendants, we conclude that any factual disputes plaintiffs may have raised are not material and affirm the district court's grant of summary judgment.

The precise parameters of what governmental conduct constitutes a taking are uncertain; plaintiffs contend that the district court invoked the wrong test. They assert that the court should have applied a three-factor balancing test focusing upon (1) the "character of the governmental action"; (2) the "interference with reasonable investment backed expectations"; and (3) "the economic impact of the regulation" (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979)).[29]

clause for a private taking. *Id.* (citing *Midkiff*). He also expresses disapproval of addressing private takings cases under the Due Process Clause on the ground that the substantive due process concept "invests judges with an uncanalized discretion to invalidate federal and state legislation." *Id.* at 465.

Ultimately, Judge Posner decided not to resolve the issue, finding on the facts of the case that there was neither a taking (in the language of the Takings Clause) nor a deprivation (in the alternative language of the Due Process Clause):

The present case is so remote from a plausible violation of substantive due process that we need not decide whether, or to precisely what extent, the concept limits takings by state and local governments; or whether the takings clause does so; or whether both or neither do so and if both whether there is any practical difference....

*Id.* at 466. Our case is of a similar nature. *See infra* part IV.

27. *But see HMK Corp. v. County of Chesterfield*, 616 F.Supp. 667, 670 (E.D.Va.1985) ("[U]ntil such time as the State court determines through the available condemnation procedures the public/private use issue, the matter is not ripe in

this Court for a determination of [a] § 1983 action.") In so holding, the court in *Chesterfield* essentially imposed an exhaustion requirement, in violation of *Patsy v. Florida Bd. of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

28. Although we express no opinion on the question of whether the definition of a "taking" for purposes of the Takings Clause is coterminous with the definition of a "deprivation" for purposes of the Due Process Clause, *see supra* note 26, we do conclude that the defendants' conduct effected neither a taking nor a deprivation. *See Coniston*, 844 F.2d at 466 (facts of case "so remote" from constituting either taking or deprivation that it was unnecessary to decide under which clause the case should be analyzed). As the parties and district court framed the issue in terms of a taking, we consider the issue in those terms.

29. The plaintiffs concomitantly argue that they have raised a genuine issue of material fact with respect to each of these. For instance, they contend that the running of the races violated a

Plaintiffs' slavish reliance upon the three factors mentioned in *Kaiser Aetna* is inappropriate. The pertinent language from that case is as follows:

> [T]his Court has generally "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Rather, it has examined the "taking" question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action—that have particular significance.

*Kaiser Aetna*, 444 U.S. at 175, 100 S.Ct. at 390 (citations omitted).

This language reveals that the three-factor analysis upon which plaintiffs so heavily rely does not actually exist. In reality, the Court has encouraged the lower courts to engage in "ad hoc, factual inquiries" into numerous factors. By simply giving examples, the Court did not promulgate the rigid test that the plaintiffs embrace. Moreover, subsequent Supreme Court opinions have not automatically invoked this purported three-part test. *See, e.g., Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).

Furthermore, the cases reveal that the three illustrative factors in *Kaiser Aetna* are themselves somewhat amorphous and inclusive of other factors. For example, the "character of the governmental action" is particularly wide-ranging. In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), in discussing the character of the governmental action, the Court noted that

---

variety of state and local ordinances and that the legality of their conduct is pertinent to the inquiry into the "character of the governmental

" '[a] "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government....' " *Id.* at 426, 102 S.Ct. at 3171 (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).

■ Accordingly, even though the Court has invoked the three factors mentioned in *Kaiser Aetna*, they are by no means the only (or even necessary) inquiries. Instead, the circumstances of each case determine the factors a court should consider in a takings case. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (Court focused on reasonable investment backed expectations where pesticide company forced to turn over trade secrets to government); *Hodel v. Irving*, 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (Court focused on "character of governmental action" where government action destroyed "one of the most essential sticks in the bundle of rights that are commonly characterized as property").

■ The circumstances of the case *sub judice* indicate that certain factors should be considered in determining whether defendants effected a taking of private property. These include (1) the limited amount of time during which the defendants' conduct affected plaintiffs' use and enjoyment of their property; (2) the limited nature of the interference with plaintiffs' use and enjoyment; and (3) the lack of any physical invasion of plaintiffs' property.

The evidence is uncontroverted that defendants' conduct impaired plaintiffs' use of their property for a limited time only. The automobile races took place over two short time spans in two separate years. The races did not run continuously during those periods. The relatively insignificant duration of the offensive governmental conduct undermines plaintiffs' argument that the defendants "took" their property within the meaning of the Fifth Amendment.

---

action." In addition, they have produced affidavits alleging that the races reduced the respective values of their homes.

Plaintiffs correctly cite *First English* to the effect that temporary government interference can constitute a taking. However, it surely does not stand for the proposition that all temporary interferences are takings. A closer look at *First English* reveals that it is fully distinguishable from the facts of our case. There, the plaintiffs challenged a county ordinance forbidding them from constructing any buildings on their property. Because the regulation was of limited duration, the Court faced the question "whether abandonment [of the regulation] by the government requires payment of compensation for the period of time during which regulations deny a landowner all use of his land." 482 U.S. at 318, 107 S.Ct. at 2387.

However, simply because *First English* involved a temporary interference with land use does not entitle plaintiffs to victory. Because of the procedural posture of that case, the Court was compelled to "treat as true" the allegation in the complaint that "the ordinance in question denied appellant all use of its property." *Id.* at 321, 107 S.Ct. at 2389. Plaintiffs do not even contend in the case at bar that the races denied them "all use" of their property.

Plaintiffs cite *Loretto* for the proposition that a relatively minor interference with property still can constitute a taking. Although the case undoubtedly supports that assertion, it is nonetheless distinguishable on its facts. In that case, the claimants challenged a city ordinance requiring them to allow a cable television company to install cables on their property. The Court stressed that this was "a permanent physical occupation of real property" in concluding that the statute effected a taking. 458 U.S. at 427, 102 S.Ct. at 3171. In contrast, the governmental conduct in our case affected the plaintiffs' property in a way that was neither permanent nor physical, as in *Loretto*.

The "character of the governmental action" in our case also undermines plaintiffs' argument that there was a taking. Numerous cases have stressed that a court will be more likely to find a taking where the governmental action interferes with "one of the most essential sticks in the bundle." *Kaiser Aetna*, 444 U.S. at 176, 100 S.Ct. at 391. The running of the races did not deprive the residents of one of those "most essential sticks." In both *Nollan* and *Monsanto*, the Court recognized that the right to exclude others was one of the most essential attributes of property ownership. In *Nollan*, the Court on that basis found that the government took plaintiffs' property by requiring them to forfeit an easement over their land. The races impaired no such essential attribute.

Furthermore, courts have rarely found a taking when the governmental conduct would give rise to a nuisance action at common law. *See, e.g., Smith v. City of Brenham*, 865 F.2d 662 (5th Cir.) (proposed operation of landfill near plaintiff's land not a taking) *cert. denied,* —— U.S. ——, 110 S.Ct. 60, 107 L.Ed.2d 27 (1989); *Citizens Ass'n v. International Raceways, Inc.*, 833 F.2d 760 (9th Cir.1987). In cases concerning the operation of airports, the courts have found takings only where flights "are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of land." *Compare United States v. Causby*, 328 U.S. 256, 266, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946) *with Batten v. United States*, 306 F.2d 580, 584 (10th Cir.1962) (no taking), *cert. denied,* 371 U.S. 955, 83 S.Ct. 506, 9 L.Ed.2d 502 (1963) *and Avery v. United States*, 330 F.2d 640, 645, 165 Ct.Cl. 357 (1964) *and Branning v. United States*, 654 F.2d 88, 99, 228 Ct.Cl. 240 (1981) (per curiam). The running of auto races for three or four days simply does not constitute a taking.

Because we conclude that there was no taking in this case, we do not consider the private defendants' alternative argument that, as private entities, they cannot be held liable under section 1983 in any event. Nor do we address plaintiffs' argument that the taking was for a private purpose. All that remains are plaintiffs' pendent state law claims and their equal protection claim in *Pierce*.

## V. EQUAL PROTECTION CLAIM.

### A. Substantive Claim.

The *Pierce* plaintiffs contend that defendant Wise permitted Fair Park to be used for the two grand prix races, that he "took no precautions to assure that the races would not produce unlawful noise in the neighborhoods," and that he took no enforcement action in response to allegedly unlawful noise levels. Although none of these actions in itself violates the Constitution, plaintiffs contend Wise would have acted differently had predominantly white neighborhoods surrounded Fair Park. Wise asserted unsuccessfully that he was qualifiedly immune from suit.

■ In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court addressed the scope of defendants' immunity from suit under section 1983. It held that section 1983 claimants must establish that the defendant's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The Court later considered whether the denial of an immunity-based summary judgment motion is immediately appealable under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). As a general rule, only a final judgment of the district court is appealable. A court's denial of a summary judgment motion is interlocutory in nature and, thus, ordinarily not appealable.

■ However, under the "collateral order doctrine," an interlocutory order is appealable if it falls within "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). In *Mitchell*, the Court held "that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." 472 U.S. at 530, 105 S.Ct. at 2817.

In this case, the district court provisionally denied Wise's motion for summary judgment and ordered limited discovery. The court first concluded that "it is clear that if Plaintiffs' allegations are true, Defendants' actions violated clearly established constitutional law by intentionally discriminating against Plaintiffs on the basis of race." It then declared that Wise's entitlement to immunity depended upon whether a discriminatory animus infected his actions. It ordered additional discovery on the issue of Wise's intent.

■ In reaching the above-quoted conclusion, the district court, to some degree, anticipated the appropriate analysis as outlined in *Siegert v. Gilley*, — U.S. —, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991), in which the Court stated, "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." In *Siegert*, the Court holds that a court addressing a claim of qualified immunity should *first* consider "whether the plaintiff asserted a violation of a constitutional right at all" before reaching the possibly unnecessary question of whether the plaintiff asserted a violation of a "clearly established" right. *Id.* ("the Court of Appeals should not have assumed without deciding this preliminary issue"). *Accord Quives v. Campbell*, 934 F.2d 668, 670 (5th Cir.1991).

■ In our case, the district court essentially followed that mandated analysis in first concluding that "if Plaintiffs' allegations are true, Defendants' actions violated clearly established constitutional law by intentionally discriminating against Plaintiffs on the basis of race." We, however, disagree with that conclusion; in fact, we find that plaintiff did not allege a constitutional violation at all, "clearly established" or not, for the complaint does not

state facts that, even if true, would constitute a violation of the Equal Protection Clause.

The *Pierce* plaintiffs contend that defendants would not have allowed the grand prix races "adjacent to neighborhoods with a predominantly white population." They also assert that had the races occurred near white neighborhoods, defendants would have taken precautions to minimize the noise levels and enforced noise ordinances. But even if this were true, such conduct, however offensive, would not violate the Equal Protection Clause, which mandates similar treatment for those similarly situated. *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 442, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Because the plaintiffs failed to allege the existence of a similarly situated non-minority neighborhood (i.e., one near a location suitable for an automobile race), their complaint does not allege an equal protection violation.

This court has adhered, as we must, to the Supreme Court's interpretation of the Equal Protection Clause. For example, in *Peyote Way Church of God, Inc. v. Thornburgh,* 922 F.2d 1210 (5th Cir.1991), we considered whether the application of a particular federal regulation to a specific group but not to plaintiffs' group violated the equal protection maxim. Our methodology in that case indicates our adherence to the above-stated interpretation:

"[W]hether [the regulation at issue] violates the equal protection principle depends on whether [members of the group to whom the regulation applies] are similarly situated to other members of our society." *Id.* at 1214. Similarly, in *Mahone v. Addicks Utility District,* 836 F.2d 921, 932 (5th Cir.1988), we stated, "Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws." [30]

The *Pierce* plaintiffs have failed to allege the existence of any similarly situated group of whites that have been treated differently. Their claim is purely hypothetical: that defendants *would have* acted differently had a predominantly white neighborhood surrounded Fair Park. They do not allege that there was an additional suitable location for a grand prix race near a predominantly white neighborhood nor that defendants chose Fair Park, as opposed to some other location, because it abuts minority neighborhoods.[31]

The Equal Protection Clause proscribes racially-motivated differential treatment. As we said in *Cronn,* 717 F.2d at 169, "[t]he essence of an equal protection claim is that other persons similarly situated as is the claimant unfairly enjoy benefits that he does not or escape burdens to which he is subjected." In the case at bar, there simply is no similarly situated group of

**30.** *See also Griffith v. Johnston,* 899 F.2d 1427, 1441 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); *Brennan v. Stewart,* 834 F.2d 1248, 1257 (5th Cir.1988) ("a violation of the equal protection occurs only when the government treats someone differently than other similarly situated"); *United States v. Cronn,* 717 F.2d 164, 169 (5th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3586, 82 L.Ed.2d 884 (1984); *United States v. Harrelson,* 713 F.2d 1114, 1117 (5th Cir.1983), *cert. denied,* 465 U.S. 1041, 104 S.Ct. 1318, 79 L.Ed.2d 714 (1984). *Cf. LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir. 1991) (black inmate stated cause of action where he alleged that similarly situated white inmates were given preferred work assignments).

**31.** It is well settled that the plaintiff must specifically allege the actual existence of a similarly situated group of persons. *E.g., Yale Auto Parts v. Johnson,* 758 F.2d 54, 61 (2d Cir.1988) (complaint is "wholly insufficient to state an equal protection claim, absent the essential allegation that others were treated differently"); *Mlikotin v. City of Los Angeles,* 643 F.2d 652, 654 (9th Cir.1981) (complaint insufficient because it did "not allege the unequal treatment of persons similarly situated that would be the gravamen of a complaint for denial of equal protection" (citations omitted)); *Beacon Syracuse Assocs. v. City of Syracuse,* 560 F.Supp. 188, 198 (N.D.N.Y. 1983) (equal protection claim dismissed because complaint did not allege manner in which plaintiff was treated differently from others similarly situated).

whites that have escaped the burdens to which plaintiffs have been subjected. The complaint does not even allege that defendants *chose* between similarly situated blacks and whites in determining where to hold the grand prix race. Accordingly, it fails to state a constitutional violation.[32]

### B. Procedural Claim.

Finally, plaintiffs contend that we are without appellate jurisdiction over Wise's appeal. They rely upon *Mitchell*'s requirement that the denial of summary judgment must "turn[ ] on an issue of law." 472 U.S. at 530, 105 S.Ct. at 2817. They argue that the district court's denial turned on an issue of fact (Wise's intent) and that the immunity question cannot be resolved without discovery into Wise's state of mind.

Assuming *arguendo* that the denial of qualified immunity ultimately turned on an issue of fact, the only reason that is so is that the court erroneously decided an issue of law, i.e., whether the complaint stated a constitutional cause of action at all. Accordingly, the district court's denial of summary judgment, at an analytically prior stage, *did* turn on an issue of law. *See Siegert*, 111 S.Ct. at 1793 (whether complaint states constitutional cause of action is "purely legal question"). Therefore, we have jurisdiction over the appeal from the denial of Wise's immunity-based summary judgment motion.

### VI. CONCLUSION.

We affirm the district court's grant of summary judgment to defendants. We reverse the judgment insofar as it denies Wise's claim of qualified immunity and re-

mand for further proceedings consistent herewith.[33]

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.[34]

---

**32.** In concluding that defendants would not have violated the Equal Protection Clause even if they did possess some discriminatory animus, we do not mean to imply that defendants did in fact harbor any racially discriminatory proclivities. At the same time, even though we hold that the Equal Protection Clause does not reach such conduct in the absence of a similarly situated group of whites, we certainly do not condone such alleged behavior.

**33.** After granting summary judgment on plaintiffs' federal law claims, the district court dismissed the pendent state law claims without prejudice. We agree with the court's disposition of those claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

**34.** As we stated in *Samaad I*, 922 F.2d at 220 n. 4, plaintiff Samaad, being the only remaining appellant in No. 90–1099, must bear all taxable costs in that appeal.